UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF MISSISSIPPI

UNITED STATES OF AMERICA

v.                                         CRIMINAL NO. 3:18-CR-00102-GHD-RP

DAN V. SHARP

## MEMORANDUM OPINION

This matter is before the Court on Defendant Dan Sharp's motion to suppress, Doc. 27, and supplemental motion to suppress, Doc. 44.

On August 23, 2018, Sharp was indicted for multiple counts of possessing controlled substances, possessing controlled substances with the intent to distribute, and possessing firearms as a convicted felon. Of the 19 counts within the indictment, 12 arose from two searches of Sharp and his vehicle by the DeSoto County Sheriff's Department on February 14, 2018, and April 19, 2018. Sharp challenges the constitutionality of those searches and moves to suppress the evidence that was obtained from them.

The Court held an evidentiary hearing on March 11, 2019, and received memorandum briefs from both Sharp and the United States. For the reasons set forth below, the Court holds that these motions should be denied, and that the evidence should not be suppressed.

### I. Standard of Review

Generally, on a motion to suppress, the defendant has the burden of proving, by a preponderance of the evidence, that the evidence in question was obtained in violation of his constitutional rights. *United States v. Guerrero-Barajas*, 240 F.3d 428, 432 (5th Cir. 2001). However, "[w]hen the government searches or seizes a defendant without a warrant, the government bears the burden of proving, by a preponderance of the evidence, that the search or seizure was constitutional." *Id.*

"[C]redibility determinations and the resolution of conflicting testimony at a suppression hearing are the responsibility of the district court as trier of fact." *United States v.*

1

*Turner*, 628 F.2d 461, 465 (5th Cir. 1980). "In an evidentiary hearing, the Court sits as a finder of fact and must resolve all disputed issues." *United States v. Lopez*, 817 F. Supp. 2d 918, 919 fn.2 (S.D. Miss. 2011) (citing *United States v. Willis*, 525 F.2d 657, 659 (5th Cir. 1976)).

## II. February 14, 2018, Search

### a. Facts

DeSoto County Sheriff's Deputy Jacob Bramlett testified that on February 14, 2018, at around 2:00 a.m. he was traveling in the left-hand lane northbound on Highway 51 in DeSoto County. Roughly half a car length in front of him in the right northbound lane was a white Chevrolet Impala. Bramlett testified that the Impala abruptly swerved into his lane, nearly hitting his car and causing him to swerve into center turn lane.

Bramlett initiated his lights and pulled the Impala over. He approached the car and found it driven by the defendant, Dan Sharp. Bramlett testified that Sharp seemed drowsy, lethargic, and could not keep his eyes open. Bramlett asked Sharp for his driver's license and proof of insurance. Sharp told Bramlett that his license had been suspended and that he had no insurance.

During this time Bramlett testified that Sharp kept reaching his hands in his pocket. Bramlett asked Sharp whether any weapons were in the vehicle, and Sharp responded that there was handgun in the car. Bramlett asked Sharp to remove himself from the vehicle, and Sharp did so. Bramlett testified that once Sharp was out of the vehicle, he could smell burnt marijuana coming from his clothing. Bramlett frisked Sharp and found a pistol magazine in his jacket pocket.

Bramlett then entered Sharp's car to retrieve the handgun from the center console. As he did so, he noticed a toiletry bag that visibly contained marijuana. Bramlett retrieved the bag opened it up and saw more narcotics. After retrieving the gun, Bramlett radioed in

2

Sharp's ID and the serial number on the gun and dispatch informed him that Sharp was a convicted felon.

Later, Deputy Tyler Brown, a DUI enforcement deputy, with the DeSoto County Sheriff's Department, arrived on the scene. He testified that he spoke to Sharp in the back of Bramlett's patrol car. As he opened the door, he too said that he smelled burnt marijuana coming from Sharp's clothing. Brown testified that Sharp seemed "out of it." Brown advised Sharp of his *Miranda* rights. During their conversation, Sharp informed Brown that within the last hour he had used methamphetamine.

Sharp testified that he was traveling on Highway 51 to his hotel, when he noticed that two deputies were behind him. Sharp testified that he traveled from the intersection of Roscoe and Highway 51 for approximately six minutes until the deputies pulled him over.

Sharp testified that he had problems with his car, including having a wire hanging from the back left wheel and some front end issues. He also testified that it was raining heavily at the time and that water was pooling in parts of the road making it difficult to drive. However, Sharp denied ever swerving his car.

Sharp further testified that Bramlett approached his car and stated that he had pulled Sharp over for crossing the yellow center line. Sharp confirmed that he told Bramlett he had no license or insurance but denied being under the influence of anything and denied telling Bramlett about a gun in the car. And although, Sharp admitted to being addicted to narcotics he denied being on them at that particular time.

Agents from the Desoto County Special Investigations Division arrived and continued the search of Sharp's car, which revealed multiple narcotics and firearms.

*b. Analysis*

Sharp argues that the initial stop of his vehicle was made without probable cause.

Traffic stops are seizures for Fourth Amendment purposes. *United States v. Lopez-Moreno*, 420 F.3d 420, 430 (5th Cir. 2005). The legality of a traffic stop is analyzed under

the two-part *Terry* framework, asking whether the officer's action was "(1) 'justified at its inception', and (2) 'reasonably related in scope to the circumstances which justified the interference in the first place.'" *Id.* (quoting *Terry v. Ohio*, 392 U.S. 1, 19–20, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)).

"For a traffic stop to be justified at its inception, an officer must have an objectively reasonable suspicion that some sort of illegal activity, such as a traffic violation, occurred, or is about to occur, before stopping the vehicle." *Id.* (citing *United States v. Breeland*, 53 F.3d 100, 102 (5th Cir. 1995)).

The Court finds the testimony of Bramlett and Brown much more credible than Sharp's. First, Sharp admits that his car had mechanical issues and that the rain made it difficult to drive. Indeed, at one point, Sharp seemed to state that the water caused his car to hydroplane. Thus, it is likely that Bramlett observed Sharp, if not actually swerving, then performing some action with the vehicle that could have appeared to be swerving.

Second, Sharp's testimony of the timeline between first seeing Bramlett behind him and stopping is implausible. Sharp testified that he noticed Bramlett behind him while stopped at the red light at the intersection of Highway 51 and Rascoe Road. He stated that after the light changed, Bramlett followed Sharp for about 6 minutes down Highway 51 before pulling him over. Sharp testified that they did not encounter any other red light between Rascoe Road and 1st Commercial Drive where he was pulled over. Sharp testified that the speed limit was 45 miles per hour. The distance between the Rascoe Road and 1st Commercial Drive along Highway 51 is approximately one mile. For Sharp's testimony that Bramlett followed him for approximately six minutes before stopping him to be true, Sharp would have had to have traveled at an average of only 10 miles per hour over that

4

distance.[1] The Court does not find it credible that Sharp would have been driving so slow on a four-lane road.

Finally, Sharp alluded to several pieces of evidence that would corroborate his testimony. Sharp contended that he made two separate phone calls during the time that Bramlett followed him. He also contended that the times on the dispatch report did not match up with Bramlett's testimony. But Sharp did not introduce any of that corroborating documentation into evidence, even though it was available to him.

Accordingly, the Court finds that based on Bramlett's testimony, he had reasonable suspicion to believe that Sharp was driving carelessly, and thus the initial stop was constitutional.

Bramlett was further justified in continuing the stop to investigate potential criminal activity. Bramlett asserts that when he approached Sharp, he appeared drowsy, and his speech was slurred. Further, Sharp could not provide a driver's license or proof of insurance.

Bramlett was also justified in removing Sharp from the vehicle and frisking him. "'When an officer is justified in believing that the individual whose suspicious behavior he is investigating at close range is armed and presently dangerous to the officer or to others,' he may conduct a limited protective search for concealed weapons." *United States v. Tuggle*, 284 F. App'x 218, 223 (5th Cir. 2008) (quoting *Terry*, 392 U.S. at 27). Sharp told Bramlett that he was in possession of a handgun, and Sharp continued to put his hands in his pockets even after Bramlett instructed him not to.

It was also permissible for Bramlett to enter and search the vehicle. First, retrieving the firearm in the center console was a continuation of the *Terry* frisk of Sharp's person. An officer may search the areas of an automobile where a weapon may be placed "if the

---

[1] This figure was calculated by using the formula speed = distance/time, where distance equals 1 mile and where time equals 0.1 hour (6 minutes/60 minutes in an hour). 1 mile/0.1 hour = 10 miles per hour.

5

officer possesses a reasonable belief based on specific and articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the officer in believing that the suspect is dangerous and the suspect may gain immediate control of weapons." *United States v. Michelletti*, 13 F.3d 838, 840 (5th Cir. 1994) (quoting *Michigan v. Long*, 463 U.S. 1032, 1049, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983) (internal citations and quotation marks omitted)). Clearly, Bramlett possessed a reasonable belief that there was a firearm in the center console because Sharp told him so.

Second, "[i]t is well-settled that probable cause to search an automobile exists when trustworthy facts and circumstances within the officer's personal knowledge would cause a reasonably prudent man to believe that the vehicle contains contraband." *United States v. Edwards*, 577 F.2d 883, 895 (5th Cir. 1978) (en banc). Sharp stated he was in possession of a firearm in the car. Thus, at the least Bramlett knew that Sharp was illegally possessing a firearm in the car. Further, Sharp's slurred speech, bloodshot eyes, and the smell of marijuana on his clothing provided Bramlett with probable cause to believe that the vehicle contained narcotics.

Accordingly, the February 14, 2018 search was constitutionally permissible.

### III. April 19, 2018, Search

*a. Facts*

Desoto County Special Investigations Division Agent Thomas Brea testified that he and a confidential informant were exchanging text messages regarding individuals selling narcotics, including Dan Sharp. Brea forwarded the informant to DEA Task Force agent Josh Bryant.

Bryant testified that he received a call from the informant telling him that Sharp was currently at the courthouse in Hernando, Mississippi, with a large amount of methamphetamine with him. Bryant testified that this informant had given him reliable information in

the past, and both Bryant and Brea testified that the informant had worked with other deputies in DeSoto County before.

Bryant testified that the informant stated Sharp was driving a white or silver Chevrolet Impala with a mismatched front end, and that he was carrying a black drawstring bag containing a large amount of methamphetamine. Additionally, the informant told Brea that within the black drawstring bag, Sharp kept a cell phone box, and that that's where the narcotics would be located. Bryant performed a criminal history check on Sharp that revealed that Sharp's driver's license was suspended. Bryant forwarded the information he had on Sharp to Brea and Deputy Brian Perkins.

Brea, Bryant, Perkins, and other agents then travelled to the courthouse in Hernando, where they located a white Chevrolet Impala that matched the description provided by the informant. Bryant ran the plates and confirmed that the vehicle was registered to Sharp. After several minutes, Sharp exited the courthouse, entered the vehicle and drove to the county administrator's office. After several minutes there, Sharp drove to a tattoo shop. Brea parked his unmarked vehicle across the street.

Brea testified that at the shop, he observed Sharp exit the vehicle with a drawstring bag and enter the store. After about 10 minutes, Sharp cam back out of the shop, and got into the vehicle still carrying the bag. After he entered the vehicle, a tattoo shop employee exited the store and went to the passenger side vehicle. The employee opened the door and reached into the vehicle and appeared to grab something from Sharp while still standing outside. The employee then entered the vehicle. Brea testified that he had observed over 100 hand to hand drug transactions, and that on other occasions, Brea had witnessed drug deals done in this manner. Brea testified that while he could see outside the vehicle, the windows were tinted such that Brea could not see inside. Afterwards, a second store employee came out to the car and entered the vehicle.

At that point, Brea advised Perkins and another deputy to initiate a stop of Sharp. As Perkins approached, he smelled marijuana coming from the vehicle. Perkins and the other

officer removed all of the occupants from the vehicle and began searching the car. Inside, Perkins found the black drawstring bag. Inside the bag, he found a cell phone box that contained what Perkins believed to be methamphetamine. Additionally, the search revealed several cell phones, cash, and digital scales.

At a later forfeiture hearing, Brea testified that the tip he received was from an "anonymous" individual. Brea testified that he stated so at the time in order to protect the informant's identity.

*b. Analysis*

Sharp argues that the information provided by the tip was insufficient to provide the agents with reasonable suspicion that Sharp was engaged in illegal activity in order to detain him and ultimately search his vehicle.

To determine whether a tip provided by an informant establishes reasonable suspicion to permit law enforcment to perform an investigatory detention requires an analysis of the totality of the circumstances surrounding the informant and the tip. *Alabama v. White*, 496 U.S. 325, 328, 110 S. Ct. 2412, 2415, 110 L. Ed. 2d 301 (1990). An anonymous tip, standing alone, "seldom demonstrates the informant's basis of knowledge or veracity," such that the it can form the basis of reasonable suspicion. *Id.* at 329. However, in some instances a tip may be "suitably corroborated" such that it "exhibits 'sufficient indicia of reliability to provide reasonable suspicion to make the investigatory stop.'" *Florida. v. J.L.*, 529 U.S. 266, 270, 120 S. Ct. 1375, 1378, 146 L. Ed. 2d 254 (2000) (quoting *White*, 496 U.S. at 327).

Under Fifth Circuit case law, when assessing whether a tip, from a known informant or not, is reliable, the Court must consider many factors, including:

> the credibility and reliability of the informant, the specificity of the information contained in the tip or report, the extent to which the information in the tip or report can be verified by officers in the field, and whether the tip or report concerns active or recent activity, or has instead gone stale.

8

*United States v. Gonzalez,* 190 F.3d 668, 672 (5th Cir. 1999). "If a tip is provided by an anonymous informant, such that the informant's credibility and reliability cannot be determined, the Government must establish reasonable suspicion based on the remaining factors. *United States v. Gomez,* 623 F.3d 265, 269 (5th Cir. 2010).

Multiple agents testified that they knew the identity of the informant. Bryant testified that he had personally received reliable information from the informant in the past, and the other agents testified that they knew he had provided reliable information to other agents before. Nonetheless, even if the informant were anonymous, his tip bore sufficient indicia of reliability and was corroborated by the agents' observations, such that what the agents later observed combined with the tip provided them with reasonable suspicion to initially detain Sharp.

First, regardless of the information provided by the caller, agents independently confirmed that Sharp did not have a valid driver's license. Agents then observed Sharp driving. "An officer may stop a motorist for a traffic violation even if, subjectively, the officer's true motive is to investigate unrelated criminal offenses." *United States v. Goins,* No. CR. 09-CR-00115-03, 2010 WL 773733, at *4 (W.D. La. Mar. 3, 2010) (citing *United States. Lentz,* 162 F. App'x 379, 382 (5th Cir. 2006)). That gave the agents reasonable suspicion of criminal activity, and justified the initial detention.

Second, the agents independently conducted observation that corroborated the information in the tip. Sharp cites to *Florida v. J.L.* in support of his motion. 529 U.S. 266, 270, 120 S. Ct. 1375, 1378, 146 L. Ed. 2d 254 (2000). In *J.L.* an anonymous caller reported to police that a "young black male standing at a particular bus stop and wearing a plaid shirt was carrying a gun." *Id.* at 268. Police arrived at the stop shortly after and observed three black males, one of whom was wearing a plaid shirt. *Id.* The police observed no criminal behavior, or any other activity that would suggest illegal conduct, nor did the officers see a firearm. *Id.* Nonetheless, the police approached the male in the plaid shirt, who was a minor, frisked him, and found a firearm. *Id.* at 268–269.

9

On appeal, the Supreme Court held that the tip alone did not provide a level of reliability to permit the officers to frisk the minor. *Id.* at 271. The only information in the tip that could be corroborated was that there was, in fact, a young male at the bus stop in a plaid shirt. *Id.* at 273. That was only sufficient to indicate that this was "the person whom the tipster mean[t] to accuse." *Id.* There was nothing the police observed that corroborated the fact that the individual was in possession of a gun. *Id.*

In *Alabama v. White*, 496 U.S. 325, 328, 110 S. Ct. 2412, 2415, 110 L. Ed. 2d 301 (1990), the Supreme Court also reviewed an investigatory stop premised on an anonymous tip. There, an anonymous caller informed police that a specific woman, named Vanessa White, would be leaving a specific apartment, in a specific car with a broken tail light. 496 U.S. at 327. The informant also stated that White would go to specific place and would be in possession of cocaine inside a brown briefcase. *Id.* Police went to the apartment building, and observed a woman enter the vehicle described by the informant, and then travel to the motel identified by the informant. *Id.* The police stopped White and found in her possession a brown briefcase that contained marijuana. *Id.* The Supreme Court upheld the stop because police had corroborated much of tip, and the tip was sufficient in its specificity not just of the individual's identity, but also of her movements, such that the caller would likely be aware of that the suspect was engaged in criminal activity. *Id.* at 329-330.

This case is much more like *White* than *J.L.* First, the caller identified Sharp by name, accused him of specific illegal activity, and indicated where Sharp could be found. The agents located Sharp, where it was said he would be, driving the car that informant stated Sharp would be in. Further, the informant was able identify a particular object (the black drawstring bag) that Sharp would be carrying and was able to identify that within that bag would be a specific item (the cell phone box) containing narcotics. Like in *White*, that information alone indicated that informant had particular knowledge of what Sharp was carrying, and thus the informant was likely to know that Sharp was engaged in illegal activity. And after the agents located Sharp, they observed him and identified actions that

were consistent with a drug transaction. The informant's specific allegations about what Sharp would be carrying, combined with corroborating information and actions the agents knew to be consistent with a drug deal were sufficient to give the agents reasonable suspicion that Sharp was engaged in criminal activity. *See e.g. United States v. Miller*, 136 F. App'x 607, 608 (5th Cir. 2005) (per curiam) (affirming that officers had reasonable suspicion to stop defendant after receiving an anonymous tip that defendant was involved in an active drug transaction where officers verified information provided by the caller.) Thus, the initial stop was constitutional. And as before, once the agents lawfully engaged in the initial stop and smelled marijuana coming from the vehicle, they were permitted to search the vehicle for narcotics.

## Conclusion

For these reasons the Court finds that the United States has proved by a preponderance of the evidence that the searches that occurred on February 14, 2018, and April 19, 2019 were constitutional. Accordingly, Sharp's motions to suppress are denied.

An order in accordance with this opinion shall issue.

This, the 14th day of March, 2019.

/s/ Glen H. Davidson
SENIOR U.S. DISTRICT JUDGE